UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOSIF KOVACO,　　　　　　　　　　　　:
　　　　Plaintiff,　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
v.　　　　　　　　　　　　　　　　　　　:　　　3:11-cv-00377-WWE
　　　　　　　　　　　　　　　　　　　　:
ROCKBESTOS-SURPRENANT CABLE　　　:
CORP.,　　　　　　　　　　　　　　　　　:
　　　　Defendant.　　　　　　　　　　　:

### MEMORANDUM OF DECISION
### ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Josif Kovaco filed this action against defendant Rockbestos-Surprenant Cable Corp., alleging discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12101, the Age Discrimination in Employment Act ("ADEA") 29 U.S.C. §621-634, Title VII of the Civil Rights Act of 1964 ("Title VII") 42 U.S.C. §2000e *et seq.*, the Family Medical Leave Act ("FMLA") 29 U.S.C. § 2601 *et seq.*, Connecticut General Statutes §46a-60(a)(1) and (a)(4), and Connecticut common law.  Specifically, plaintiff alleges that he was discriminated against and terminated based on his disability, age, national origin, and use of medical leave.  In addition, plaintiff alleges intentional infliction of emotional distress, statutory theft and conversion of his property.

Defendant has filed a motion for summary judgment on all counts.

### BACKGROUND

In April 2005, defendant hired plaintiff as a maintenance mechanic stationed at the company's East Granby, Connecticut facility.  Plaintiff reported to defendant's maintenance supervisor, Greg Miller.

As a maintenance mechanic, plaintiff was generally responsible for repairs to a wide

range of factory equipment and machinery, as well as plumbing, welding, janitorial services, mechanical and electrical work.

Defendant's maintenance department had three electric carts and a forklift available for use by the mechanics to transport parts and tools. However, one of the three carts was assigned to a mechanic, Larry DeGreenia, who had a medical condition that inhibited his ability to walk around defendant's facility. A second cart was used predominantly by Ray Torres, who custom painted the cart and kept it locked in a cage after his shift. As a result, the third maintenance department cart was shared by the remainder of the maintenance employees.

In early December 2009, plaintiff presented a medical note from his physician calling for four weeks of "limited walking" and "no climbing stairs." During a subsequent meeting with his supervisors and an HR administrator, plaintiff requested permission to use an electric cart as needed. Plaintiff admits that defendant told him it would accommodate him by allowing him use of the electrical cart whenever he required it, but plaintiff argues that this was not accommodation as defendant was essentially maintaining the status quo: all mechanics were already permitted use of the one shared cart as needed.

Jeff Rasmus, one of plaintiff's supervisors, testified that he and Miller informed the other supervisors that a cart should be made available for plaintiff's use. However, Philip Borgia, defendant's human resources director, testified that he had no idea about whether all of plaintiff's supervisors were informed of his need for accommodation. Borgia further testified that he first learned of plaintiff's need for light duty during his deposition.

On January 6, 2010, defendant granted plaintiff's request for medical leave under the FMLA and subsequently restored plaintiff to his position as a maintenance mechanic, with no

diminution in pay, benefits or job perquisites.

On March 19, 2010, Miller directed a member of his maintenance staff, Vernon Soucy, to place an OSHA lockout tag on the shared cart and move the cart to the boiler room so it would be out of the way.  OSHA lockout tags are safety mechanisms designed to prevent workers from using equipment, machinery, or devices deemed to be hazardous or potentially hazardous. Plaintiff participated in safety training with regard to OSHA lockout policies and procedures.

During the night shift of March 19-20, plaintiff, who was working a temporary assignment on the third shift, entered the locked boiler room, broke the tag off the locked out cart, and proceeded to use the cart.  Plaintiff testified that he examined the cart before putting it into use.  Plaintiff also testified that as a maintenance mechanic, he regularly performed repairs on the electric carts and their batteries.

On March 20, 2010, when Miller reported to work, he could not immediately locate the locked out cart because it was not in the boiler room.  Miller then questioned the third shift supervisor, Kurt Burke, who reported seeing plaintiff use the cart.  Eventually the missing cart was found in the shipping area, a remote part of defendant's facility.  The battery was completely drained.

Rasmus and Miller spoke with plaintiff when he next reported to work on March 23, 2010, at which time plaintiff acknowledged entering the boiler room, breaking the OSHA lockout tag, and using the cart.  Rasmus placed plaintiff on suspension pending further investigation and scheduled a follow-up meeting for March 29, 2010, when defendant's director of human resources, Borgia, would be back from vacation.

When Borgia returned, Miller and Rasmus provided him with an account of the

circumstances that precipitated plaintiff's suspension.  Borgia and Rasmus agreed to keep all disciplinary options on the table until the investigation concluded.

Upon further investigation, Borgia learned that the cart was locked out because it was not holding a charge.  Plaintiff testified that he was unable to discover any mechanical or electrical issues with the cart and that he used the cart for much of his work shift without issue.

Borgia called plaintiff to a meeting on March 29, 2010, which was also attended by half a dozen other management level employees.  At the meeting, Borgia gave plaintiff an opportunity to relate his position.

After discussing the incident, the managers in attendance agreed that plaintiff's employment should be terminated.  Borgia called plaintiff back to the conference room and advised him of the decision.  He thereafter sent plaintiff a letter summarizing the reasons underlying the discharge decision.

On July 20, 2010, plaintiff returned to defendant's facility to claim his toolbox and tools.  Upon arrival, plaintiff examined his tools and loaded them into his truck.  The next day, plaintiff sent a letter to defendant alleging that his toolbox had been opened and tampered with.  Defendant, through a letter from Borgia, denied tampering with plaintiff's toolbox.

Following his termination, plaintiff submitted an application to the Social Security Administration ("SSA") for social security disability benefits.  On his application, plaintiff described his job requirements as a mechanic to include: "Walk about ½ mile for fixing machines.  I had to lift parts."  Plaintiff reported that in a typical day he spent seven and one-half hours walking and standing, one hour climbing, four hours stooping and crouching, two and one-half hours handling large objects, and eight hours per day reaching.  Plaintiff told the SSA that he

carried a pouch containing forty pounds of tools "frequently," (defined as from 1/3 to 2/3 of the workday), lifted forty-to-fifty pounds at a time, and could be required to lift as much as one hundred twenty pounds.

The SSA determined that as of March 24, 2010, five days before he was discharged, plaintiff was disabled in the sense that he lacked the "physical residual functional capacity" to work as a mechanic. The SSA declared that plaintiff's severe impairments limited him to sedentary work.

**Discrimination**

Plaintiff testified that during his employment with defendant, he was subjected to discriminatory comments based upon his national origin, ethnicity and age by co-workers. Plaintiff complained to human resources about being called "fucking Romanian," "Romanian Gypsy," "third-world countryman," and "old shit man."

Borgia testified that he declined to meet individually with the accused co-workers about plaintiff's accusations. Instead, defendant held a group meeting where employees were instructed that defendant does not stand for harassment of any type. The accused co-workers, upon learning of plaintiff's complaints, became upset at plaintiff. No discipline was levied against any of the accused, and plaintiff testified that the harassment continued.

Several of defendant's employees testified that Torres drew pictures of plaintiff. Plaintiff alleges that these pictures were discriminatory. Co-worker, Charles Williams, testified that one of Torres' drawings was labeled "old man, go back to Romania," or similar. Williams also testified that he saw Torres in Supervisor Williams' office with the picture.

Plaintiff, on several occasions, called the alert line of defendant's parent company,

Berkshire Hathaway, to make complaints of discriminatory treatment. Plaintiff alleges that defendant did not take his complaints seriously, as evidenced by defendant's failure to individually interview any of the accused perpetrators. Plaintiff further alleges that his termination was retaliation for his complaints.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. American International Group, Inc. v. London American International Corp., 664 F.2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Anderson, 477 U.S. at 249.

### Qualification

Defendant argues that plaintiff was not qualified to meet the physical demands of his job

as a mechanic when his employment was terminated.  Accordingly, defendant contends that plaintiff cannot meet the qualification requirement of his prima facie discrimination claims.

Employment discrimination claims are analyzed under the burden-shifting paradigm adopted by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

> At the first stage, the plaintiff bears the burden of establishing a prima facie case. . . .  Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee.  At the second McDonnell Douglas stage, the presumption created by the prima facie case places upon the defendant the burden of producing an explanation to rebut the prima facie case – i.e., the burden of producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason.  However, while the presumption shifts the burden of *production* to the defendant, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  If the defendant satisfies its burden of production, then the presumption raised by the prima facie case is rebutted and drops from the case.  At the final stage, the plaintiff then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision – a burden that merges with the ultimate burden of persuading the court that []he has been the victim of intentional discrimination.

Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 128-29 (2d Cir. 2012)(internal quotations omitted, emphasis in original).

Pursuant to  Title VII, "plaintiff establishes a prima facie case by showing (1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  Chin v. Port Auth. of New York & New Jersey, 685 F.3d 135, 151 (2d Cir. 2012).  These same proof requirements apply to disparate treatment claims arising under the ADEA, Bucalo 691 F.3d at 129, and the

Connecticut's Fair Employment Practices Act ("CFEPA").  Weichman v. Chubb & Son, 552 F. Supp. 2d 271, 282 (D. Conn. 2008).

Similarly, "to establish a prima facie case under the ADA, "a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability."  Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 169 (2d Cir. 2006).

In connection with plaintiff's application for disability benefits, the Social Security Administration ("SSA") determined, upon reviewing medical records and information provided by plaintiff and his physicians, that effective March 24, 2010, five days before his discharge, plaintiff was disabled and lacked the "physical residual functional capacity" to work as a maintenance mechanic.  Accordingly, defendant argues that plaintiff was no longer qualified for his position when his employment was terminated.

Plaintiff responds that disability within the meaning of the Social Security Act is not preclusive of qualification for the purposes of the ADA because the ADA allows for the possibility of reasonable accommodation.  See Mitchell v. Washingtonville Cent. School Dist., 190 F.3d 1, 7 (2d. Cir. 1999).  Plaintiff contends that with the reasonable accommodation of the electric cart, he would be qualified to perform the essential functions of his job.  Nevertheless, plaintiff reported that in a typical day he spent seven and one-half hours walking and standing, one hour climbing, four hours stooping, kneeling and crouching, and two and one-half hours handling large objects.  Plaintiff asserted that he frequently lifted between forty and fifty pounds.

The SSA determined that plaintiff is fit only for sedentary work and is limited to occasionally lifting up to twenty pounds. An electric cart would not remedy the majority of job-related deficiencies. Accordingly, plaintiff is not qualified for purposes of the ADA. See Nieman v. Syracuse University Office of Human Resources, 2013 WL 2445098, at *7 (N.D.N.Y. Jun. 5, 2013). Moreover, as reasonable accommodation is not implicated by plaintiff's national origin and age discrimination claims, they also fail for lack of qualification.

**Retaliation**

Retaliation claims under Title VII are also evaluated under the McDonnell Douglas three-step burden shifting analysis. Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010). First, the plaintiff must establish a prima facie case of retaliation by showing: (1) participation in a protected activity; (2) defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. Id. If the plaintiff meets this initial *de minimis* burden, the defendant must then articulate a legitimate, non-retaliatory reason for the adverse employment action. Id. If so, the presumption of retaliation dissipates, and the employee must show that his employer's articulated reason is merely pretext, and that but for his protected activity, his employer would not have subjected him to an adverse employment action. University of Texas Southwestern Medical Center v. Nassar, 2013 WL 3155234 at *14, 570 U.S. ___ (June 24, 2013).

Defendant does not challenge plaintiff's prima facie case of retaliation. Rather, defendant argues that in the face of its proffer of a perfectly legitimate, non-discriminatory reason for plaintiff's firing–his admitted misconduct in cutting an OSHA lockout tag off an electric cart and using the cart during his shift–plaintiff can only survive summary judgment by adducing

9

evidence that, if believed, would suffice to demonstrate that this reason was merely a pretext.

"A plaintiff may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Castelluccio v. International Business Machines Corp., 2012 WL 3729794, at *7 (D. Conn. Aug. 21, 2012).

Defendant argues that, "even accepting plaintiff's account," that the cart was perfectly functional and that Burke provided him with a key to the boiler room, plaintiff has not raised any issue of fact that would change the nature of his conduct, which resulted in his termination. The Court disagrees and finds that plaintiff's account of the facts materially changes the nature of his conduct.

If the cart was perfectly functional and Burke provided plaintiff with a key to the boiler room–so that plaintiff could retrieve the cart–plaintiff's only remaining culpability stems from cutting the OSHA lockout tag from the cart. However, accepting plaintiff's account, carts were not customarily locked-out when defective. Plaintiff contends that the cart was hidden and locked by defendant as part of a sustained effort to harass him. Moreover, plaintiff testified that it was the job of defendant's mechanics to fix the carts when they became defective. Therefore, accepting plaintiff's account as true does change the nature of his conduct. Finally, according to plaintiff, after cutting the lockout tag, he proceeded to use the cart for the duration of his shift without incident. This evidence bolsters plaintiff's assertion that the lockout tag was unnecessary. As the Court must resolve all ambiguities and draw all reasonable inferences in favor of plaintiff, defendant's motion for summary judgment will be denied as to plaintiff's

claims of retaliation under Title VII, the ADA, the ADEA and C.G.S. §46a-60(a)(4).

**Reasonable Accommodation**

Plaintiff asserts that defendant failed to accommodate his disability.  The Court will consider plaintiffs reasonable accommodation claim during the time-frame when plaintiff was capable of performing the essential functions of his job.  Defendant argues that it accommodated plaintiff beginning in December of 2009 by allowing him access to a motorized cart as needed.

"A plaintiff states a prima facie failure to accommodate claim by demonstrating that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  McBride v. BIC Consumer Products Mfg. Co., 711 F.3d 120, 125-26 (2013).

Plaintiff testified that he requested medical accommodation in the form of the use of an electrical cart and that Miller refused plaintiff's request.  Moreover, plaintiff testified that defendant failed to modify his work tasks in any way despite orders that he be on light duty.  Plaintiff points out that a similarly disabled employee with the same job title as plaintiff, DeGreenia, was allowed the exclusive use of an electric cart.  DeGreenia was the only person with a key to his cart.  In a memo to plaintiff's file dated November 30, 2009, Miller explicitly acknowledged, "I told [plaintiff] that the only maintenance person that had a cart was L. DeGreenia . . ."  Despite this representation, when Miller was deposed in connection with this lawsuit, he denied that DeGreenia had a cart specifically assigned to him.

Plaintiff has demonstrated material factual issues genuinely in dispute with regard to wether he was granted reasonable accommodation for his medical condition.  As such, summary

judgment will be denied as his accommodation claim.

**FMLA Interference and Retaliation**

Defendant argues that it granted plaintiff's lone request for FMLA leave that ran from January 6-11, 2010, and restored plaintiff to his position as a maintenance mechanic, with no diminution in pay, benefits or job perquisites.  Moreover, defendant contends that plaintiff's FMLA leave was too temporally removed from his discharge to infer retaliation.  Plaintiff concedes that he was granted FMLA leave and restored to his previous position.  Rather, plaintiff asserts that his termination constituted interference and retaliation for taking FMLA leave.

To establish a prima facie case for interference under the FMLA, a plaintiff must establish: (1) that he is an eligible employee under the FMLA; (2) that defendant constitutes an employer under the FMLA; (3) that he was entitled to leave under the FMLA; (4) that he gave notice to defendant of his intention to take leave; and (5) that defendant denied his benefits to which he was entitled by the FMLA.  Weichman v. Chubb & Son, 552 F. Supp. 2d 271, 288-89 (2d Cir. 2008).  Here, plaintiff has failed to demonstrate any denial of benefits.  Accordingly, summary judgment will be granted on the FMLA interference claim.

In order to make out a prima facie case of FMLA retaliation, a plaintiff must establish that: 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.  Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004).  As discussed above, plaintiff was not qualified for his position when he was terminated.  Therefore, summary judgment will be granted as to the FMLA retaliation claim.

**Plaintiff's Requests for Back and Front Pay**

In connection with his claims for discriminatory and retaliatory discharge, plaintiff seeks to recover back and front pay.  Defendant argues that these remedies are conclusively foreclosed as a consequence of the SSA's determination that plaintiff was incapable of meeting the physical demands associated with the job of maintenance mechanic at the time of his dismissal.

"The remedy in a discriminatory discharge case is intended to compensate a plaintiff only for losses suffered as a result of defendant['s] discrimination, and does not extend to granting back pay for a period when a plaintiff would have been unable, due to an intervening disability, to continue employment." Thornley v. Penton Pub., Inc., 104 F.3d 26, 31 (2d Cir. 1997). Therefore, plaintiff is ineligible to receive back and front pay for the periods when he was unable to continue employment.

**Intentional Infliction of Emotional Distress**

Defendant argues that plaintiff cannot demonstrate that defendant engaged in the requisite extreme and outrageous conduct necessary to prove intentional infliction of emotional distress. "In order for the plaintiff to prevail in a case for liability under ... [intentional infliction of emotional distress], four elements must be established.  It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.  Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." Appleton v. Board of Educ. of Town of Stonington, 254 Conn. 205, 210 (2000).

"Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." Id. at 211.  As discussed in the Restatement, which the Connecticut Supreme Court has accepted as the controlling standard:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46 cmt. d (1965).

Here, plaintiff testified to repeated offensive comments and drawings based upon his ethnicity and national origin over a period of several years.  Defendant, through its employees, made a number of ethnically demeaning comments toward plaintiff, including calling him "fucking Gypsy" and "old shit man."  In addition, plaintiff contends that defendant failed to address his complaints of harassment.  While this behavior, as alleged, is shameful and reprehensible, it is not so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious.  Accordingly, summary judgment will be granted on plaintiff's intentional infliction of emotional distress claim.

**Statutory Theft and Conversion of Plaintiff's Tools**

Defendant argues that plaintiff cannot demonstrate that defendant actually assumed

possession and ownership rights over plaintiff's tools.  Accordingly, defendant contends that plaintiff cannot prove that defendant misappropriated his tools for its own use.

"The tort of conversion occurs when one, without authorization, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights.  In addition, conversion requires that the owner be harmed as a result of the unauthorized act.  Similarly, statutory theft under General Statutes § 52-564 is synonymous with larceny as provided in General Statutes § 53a-119.... Pursuant to § 53a-119, a person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from the owner." Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 43 (2000).  Statutory theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion.  Suarez-Negrete v. Trotta, 47 Conn. App. 517, 521 (1998).

Defendant cites The Patterson Collection v. Sullivan, 2010 WL 1677760 (D. Conn. Apr. 21, 2010)(J. Eginton), for the proposition that evidence of unauthorized ownership is necessary to prove conversion.  However, there, the Connecticut State Marshal who seized the property at issue did so pursuant to a valid court order.  Id. at *4.  Moreover, as the Marshal seized the property on behalf of a third party, he was not exercising ownership over the property.  Id.

Defendant acknowledges that the tools may have been lost or stolen by one of its employees but contends that without evidence of defendant's possession and ownership rights over the tools that plaintiff's claim for conversion must fail.

Under the doctrine of respondeat superior, a master is liable for the wilful torts of his servant committed withing the scope of the servant's employment and in furtherance of his

master's business. Pelletier v. Bilbiles, 154 Conn. 544, 547 (1967). If a jury were to credit plaintiff's testimony that tools were taken from his toolbox, it could find by a preponderance of the evidence that agents of defendant misappropriated plaintiff's tools for their own use while acting in the scope of their employment. Accordingly, summary judgment will be denied with regard to plaintiff's statutory theft and conversion claims.

## **CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is GRANTED in part and DENIED in part. Summary judgment is granted to the defendant as to plaintiffs discrimination claims, FMLA and intentional infliction of emotional distress claims. Summary judgment is denied as to plaintiff's retaliation, reasonable accommodation and theft claims. Finally, plaintiff is ineligible for front and back pay for the periods when he was unable to continue employment due to disability.

Dated this 25th day of September, at Bridgeport, Connecticut.

                                          /s/
                                WARREN W. EGINTON
                                SENIOR UNITED STATES DISTRICT JUDGE